UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RANDONA JOHNSON,

           Plaintiff,                      Case No. 17-cv-11412

                                            Paul D. Borman
v.                                      United States District Judge

FORD MOTOR COMPANY,          Anthony P. Patti
a Michigan Corporation,           United States Magistrate Judge

           Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 38)

In this failure to accommodate action under the Americans With Disabilities Act, 42 U.S.C. § 12101 *et. seq.* ("the ADA") and the Michigan Persons With Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1101 *et. seq.* ("the PWDCRA"), Plaintiff alleges that Defendant Ford Motor Company (Defendant or "Ford"), refused to accommodate his "eight hour maximum work per shift/forty hours maximum work per week" medical restriction when Plaintiff sought to return to work as a process coach (production supervisor) at Ford's Flat Rock Assembly Plant ("FRAP"), and refused to engage with him in the interactive process, during a nine-month period from July 2015 through March 2016. Plaintiff has been clear that his failure to

1

accommodate claim involves a "closed period" of time, from July 2015 through March 2016, after which time Ford did reemploy the Plaintiff as a process coach. Plaintiff makes no claim related to the time period after April 2016, "after which time . . . Defendant did allow Plaintiff to return to work" with restrictions. (Pl.'s Resp. 6, PgID 677.)

Before the Court is Defendant's Motion for Summary Judgment. (ECF No. 38.) Plaintiff filed a Response (ECF No. 43) and Defendant filed a Reply (ECF No. 44). The Court held a hearing on November 28, 2018. For the reasons that follow, the Court GRANTS Defendant Ford's Motion for Summary Judgment.

## I.    BACKGROUND

Plaintiff was hired by Ford as a process coach at FRAP on November 19, 2012. (ECF No. 38-2, Def.'s Mot. Ex. 1, Nov. 3, 2017 Deposition of Mr. Randona Johnson 56:4-6.)  Process coaches at FRAP report to a Team Manager.  Plaintiff's Team Manager from his start date until January 1, 2013, was James Glass. (Def.'s Mot. Ex. 4, Aug. 8, 2018 Declaration of James Glass ¶ 4.)  Effective January 2, 2013, Carl Jones took over as Plaintiff's Team Manager. (Glass Decl. ¶ 4.)

On October 17, 2013, Plaintiff began a leave of absence for medical reasons, specifically back pain and high blood pressure, that continued through April 28, 2014. (Johnson Dep. 75:9-76:17.)  During this leave, on or about December 10, 2013,

Plaintiff began treating with Dr. Emmanuel Dizon as his primary care physician. (Johnson Dep. 83:16-84:5; Def.'s Mot. Ex. 5, March 29, 2018 Deposition of Emmanuel Dizon, M.D. 8:4-7.) Dr. Dizon referred Plaintiff to Dr. Lee, a neurologist, and Plaintiff returned to work at FRAP on April 28, 2014, with a restriction to "light duty work," and a four hour per day work maximum for a period of four weeks. (Johnson Dep. 78:20-79:5; Dizon Dep. 15:5-16:22, 20:16-23:7.) FRAP was able to accommodate Plaintiff's restrictions at that time. (Johnson Dep. 78:20-80:20.)

On January 27, 2015, Plaintiff began another leave of absence, again due to aggravation of his back pain and hypertension, as well as depression. (Johnson Dep. 80:21-81:15.) With regard to his depression, Plaintiff had one appointment with a mental health provider but never returned. (Johnson Dep. 81:21-83:15.) Plaintiff remained on medical leave until May 12, 2015, when he was transitioned to inactive or off-roll status. (Def.'s Mot. Ex. 3, Aug. 7, 2018 Declaration of David Scruggs ¶ 3; Def.'s Mot. Ex. 2, Aug. 13, 2018 Declaration of Joseph Closurdo ¶ 6; Def.'s Mot. Ex. 6, Sept. 4, 2018 Declaration of Julia Baumhart Ex. A, Aug. 24, 2015 Letter to Randona Johnson from Ford Human Resources ("8/24/15 HR letter".)[1] Plaintiff

---

[1] Ford's 8/24/15 letter from Human Resources informed Plaintiff that under Ford's Disability Plan, he was eligible for 70 working days at full pay, and he exhausted that eligibility on May 12, 2015, when he was placed on Ford's Extended Leave-Disability, a company unpaid medical leave, with disability benefits paid directly from Unicare. (8/24/25 letter, PgID 574.) The 8/24/15 letter further explained how

acknowledges that he continued to collect his full disability pay throughout the relevant nine-month period, but complains that this was only "roughly 50% of Plaintiff's regular wage income." (Pl.'s Resp. 11, PgID 682.)

Thus, when Plaintiff was transitioned to inactive status in May, 2015, he no longer held an "allocated" position at FRAP and his position was filled. In sworn answers to Plaintiff's Second Interrogatories and Requests for Production of Documents, Ford states that as a plant department, FRAP "cannot exceed the number of heads allocated to it," and that at the time Plaintiff attempted to return to work on July 13, 2015, "he had been moved to inactive status, at which time he ceased to hold an allocated position." (Def.'s Mot. Ex. 10, PgID 619-20.) Mr. Closurdo explains in his Declaration that "Ford's corporate finance function sets manpower levels by department and manufacturing facility," and as the FRAP "Final Area Manager" he was not permitted to exceed the manpower allocation dictated by corporate finance. (Closurdo Decl. ¶ 7.) This meant that if Mr. Closurdo "did not have an open process

---

Plaintiff should go about seeking reemployment if he elected to do so after recovering from his disability: "When your attending physician determines the estimated date on which s/he believes you will be able to return to work, please contact your supervisor and the Salaried Leaves and Termination Unit immediately. *This will allow time for placement efforts to begin*. . . . In order to receive maximum placement consideration, you must contact the Salaried Leaves and Terminations Unit within five (5) working days following the date your physician verifies you are able to return to work. You must apply for reemployment within 30 calendar days after recovery from you disability . . . . (8/24/15 letter, PgID 574) (emphasis added).

coach position, [he] could not hire or reinstate a process coach until such time as a position opened, regardless of how many hours the process coaches were having to work." (*Id.*) When Mr. Closurdo arrived at FRAP on August 1, 2015, "all production shifts were running 10.5 to 11.5 hours, meaning process coaches were working 12 to 13.5 hour shifts five days a week plus some weekends." (*Id.*; Def.'s Reply Ex. 12, Supplemental Declaration of Joseph Closurdo, Ex. A (FRAP Production Shifts for hourly workers the period July 2015-April 2016) and Ex. B (salaried time records for process coaches at FRAP July 2015-April 2016).)

Although this intense schedule persisted for some time, Mr. Closurdo had no open process coach positions and could not add one because he could not exceed the corporate finance manpower allocation. (Closurdo Decl. ¶ 7.) Mr. Closurdo was authorized, however, to obtain temporary relief when necessary for short periods of time (usually two weeks) by utilizing process coaches from other plants who were under temporary layoffs. When filling in at FRAP, these "borrowed" coaches continued to collect their salaries from their home plants, "allowing FRAP to benefit from some temporary relief that would not otherwise be available to it." (*Id.*) "Each time Plaintiff attempted to return to work once he went to inactive status in May 2015, there were no allocated positions open until his April 2016 attempt." (*Id.*) Mr. Closurdo testifies in his Declaration that, since his assignment to FRAP in August,

2015, FRAP had its first process coach manpower opening in April, 2016. (Closurdo Decl. ¶ 6.) Plaintiff acknowledged in his deposition his understanding that the FRAP was allocated a manpower maximum that they could not exceed. (Johnson Dep. 173:18-25.) Although Plaintiff believed that there were "open" positions when he sought reemployment after May, 2015, he acknowledged that these "positions" were being filled by Ford with senior process coaches from other Ford plants. (*Id*. at 156:10-157:8.) Those fill-in process coaches were paid from previously approved budget allocations at their home plant.

On July 13, 2015, seven months after beginning his January, 2015 medical leave, Plaintiff did attempt to seek reemployment with Ford, with a restriction from Dr. Dizon limiting him to working maximum eight-hour shifts and a maximum 40-hour work week through December 31, 2015. (Johnson Dep. 147:11-148:7; Pl.'s Resp. Ex. 5, 7/13/15 FRAP Manufacturing Pass – Health Center Communication.) Plaintiff went to FRAP and presented his Manufacturing Pass indicating his 8-hour/shift, 40-hour/week restriction to the Team Manager at that time, James Glass. At that time, FRAP had no open process coach positions, and process coaches were working 12 to 13.5 hour shifts. (Closurdo Decl. ¶ 7; Glass Decl. ¶ 5.) Mr. Glass testified in his Declaration that he was not aware at the time that there were no process coach manpower openings to fill at that time but he indicated on Plaintiff's Return to

Work Form "NWA," or no work available, because being able to work "any shift as well as rotating shifts and weekends," was an essential element of the process coach position and "all production shifts were running a minimum of 10.5 to 11.5 hours and a production workweek minimum of 52.5 hours, which meant process coach shifts were running a minimum of 12 to 13.5 hours and the workweek minimum of 60 to 67.5 hours." (Glass Decl. ¶ 5.) Because Plaintiff's return to work restriction limited him to 8 hour shifts and a 40 hour work week, and because there were no 8-hour process coach shifts available, Glass indicated there was no work available. (*Id.*)

Plaintiff attempted to return to work again on January 20, 2016, with the same eight-hour shift, 40-hour work week restriction, and was again told FRAP was unable to accommodate his restrictions due to production shift schedules. (Johnson Dep. 162:25-164:1, Dep. Ex. 18.) According to Ford, there were still no open allocated positions for process coaches and production shifts were running a minimum of 10 hours, therefore Plaintiff could not be reinstated with his restrictions. (Closurdo Decl. ¶¶ 6-7; Glass Decl. ¶ 5.) On this occasion, Plaintiff's Manufacturing Pass health form, indicating that there was no work available that could accommodate Plaintiff's eight-hour shift/40-hour work week restriction, was signed by Team Manager Jameka Atkinson. (Def.'s Reply, Ex. 12, Suppl. Closurdo Decl. ¶ 7.) According to Plaintiff, he made two more attempts to return to work with the same restriction, once in

February 2016 and again in March 2016, but due to the same conditions at FRAP, no open process coach positions and the inability to accommodate an eight-hour shift restriction, Plaintiff was not returned to work. (Johnson Dep. 149:17-151:1, 164:6-165:9, Dep. Ex. 19; Closurdo Decl. ¶¶ 6, 7, 9; Glass Decl. ¶¶5, 7.)

Plaintiff asserts, and provides in support a collection of Declarations from FRAP employees who were working at FRAP during the July 2015-March 2016 time frame, that there was work available for Plaintiff during the nine-month time period when he was attempting to return to work and that Plaintiff would have been utilized even if he could only work 8-hour shifts and even if other process coaches had to cover Plaintiff's job duties when Plaintiff left a shift early. (Pl.'s Resp. Ex. 7, Sept. 28, 2018 Declaration of Richard Gilmore, Jr. ¶¶ 1-6; Ex. 8, Sept. 28, 2018 Declaration of Rafig Hassan ¶¶4-9; Ex. 9. Sept. 28, 2018 Declaration of Craig Thomas ¶¶ 2-18.) Mr. Hassan testifies that when he approached Glass about brining Plaintiff back to work, Glass told him he was "just not bringing [Plaintiff] back," and that was the "end of the conversation." (Hassan Decl. ¶ 8.) Hassan testifies that he then went back to the Plant Manager, Tim Young, to explain what Glass had said and Young said he would "look into it," but Hassan never heard anything more on the subject. (Hassan Decl. ¶ 9.) Gilmore testified that Glass told him in July 2015, that there was no work available for Plaintiff and that Gilmore should "stay out of it," and that Plaintiff was

"going to get his." (Gilmore Decl. ¶ 4.) Craig Thomas, a senior process coach at FRAP at the time, testifies that from October 2015 through April 2016, he asked Team Manager Glass to bring Plaintiff back because there was so much work to be done that Thomas was covering two zones at FRAP and they could use Plaintiff's help. According to Thomas, Glass responded that he would "refuse to bring Plaintiff back with restrictions." (Thomas Decl. ¶¶ 4-6.)

James Glass also testified that being able to work any shift as well as rotating shifts and weekends were essential elements of the process coach job, and Plaintiff's inability to work the required shift hours due to his medical restriction necessitated Glass's indication of no work available on Plaintiff's Manufacturing Pass health forms in July 2015 and February 2016. (Glass Decl. ¶ 5.) Mr. Glass testified that, although he did not check to see if FRAP even had process coach manpower openings before indicating "NWA" on Plaintiff's Manufacturing Pass, there was no work available for an 8-hour shift restriction on a day-to-day basis at FRAP at the time Plaintiff attempted to return to work. Requiring other process coaches to complete Plaintiff's end of shift duties, adding 3 to 3.5 hours' worth of duties to their shifts, when they were already working 11-hour shifts, was unworkable from both an operational and personal impact standpoint. (*Id.*)

Plaintiff acknowledged that his requested accommodation involved leaving his end of shift duties, including closing the DROT, for someone else to perform. Plaintiff conceded that his accommodation would limit him to working an 8-hour shift despite the fact that shifts were running ten to eleven hours (and sometimes longer). (Johnson Dep. 126:5-8.) Plaintiff acknowledged that he was asking to shift any job duties that he could not complete to other process coaches. Plaintiff envisioned that he would work his 8 hours and then someone else could finish whatever job duties remained on Plaintiff's shift. (Johnson Dep. 169:9-22.) Specifically, Plaintiff testified that his accommodation request involved leaving the end of shift duty of closing the DROT for someone else to perform. (Johnson Dep. 124:4-6.)

In April, 2016, the FRAP was operating 10-hour production shifts five days a week, and an open process coach position had become available with the departure of Mr. Gilmore. (Closurdo Decl. ¶¶ 6,7,9; Supp. Closurdo Decl. ¶¶ 4-6; Gilmore Decl. ¶ 1.) Mr. Closurdo learned that Plaintiff was looking to return to work and he instructed FRAP Human Resources, specifically David Scruggs, to see what Ford could do to facilitate placing Plaintiff in that opening. On March 9, 2016, Mr. Scruggs sent Plaintiff paperwork to submit for his requested reinstatement as an active Ford employee. (Johnson Dep. 110:5-111:3, Dep. Ex. 13; Scruggs Decl. ¶¶ 3, 4, tab A (3/9/16 letter to R. Johnson).) Plaintiff confirmed receipt of this paperwork but then

sent an email to Mr. Scruggs on March 17, 2016, complaining that Ford was denying him an accommodation and also filed an EEOC charge on March 29, 2016, claiming Ford had failed to engage in the interactive process. (Johnson Dep. 107:5-108:19, 141:5-9, 142:4-143:6, Dep. Ex. 12; Scruggs Decl. ¶¶ 5-6; August 29, 2018 Declaration of Lannell Branch ¶ 4.)

Plaintiff was reinstated on April 18, 2016, seeking the same 8-hour shift, 40-hour work week restriction that had previously received a "no work available" response. (Scruggs Decl. ¶ 9.) In April, 2016, FRAP was operating on 10-hour production shifts which meant process coaches were working 11 to 11.5 hour shifts. (Closurdo Decl. ¶ 9.) Closurdo understood that Plaintiff was returning to work seeking a 40-hour work week, working 8-hour shifts, but Closurdo wanted to try to accommodate Plaintiff if possible so Closurdo met with Ford Medical to see if Plaintiff could work four 10-hour shifts per week rather than the usual 5 shifts. Closurdo understood that Dr. Dizon had approved this medically. (Closurdo Decl. ¶ 9.) Mr. Closurdo also still hoped that FRAP might be working shorter production schedules over the coming months, which would help in accommodating Plaintiff. (*Id*.)

In May, 2016, Mr. Glass again became Plaintiff's Team Manager and in June 2016, Glass issued Plaintiff a "coaching and counseling" after Plaintiff sent an hourly

worker to do non-bargaining unit work. (Closurdo Decl. ¶¶ 11-12; Glass Decl. ¶¶ 4, 9, tab B; Branch Decl. ¶¶ 8-9.) Craig Thomas thought this was harassment of the Plaintiff by Glass and complained to the Human Resources manager. (Thomas Decl. ¶¶ 9-10.) Plaintiff continued to work within his restrictions but FRAP never did go to the shorter shift schedules that Closurdo thought might happen. (Closurdo Decl. ¶ 10.) Mr. Closurdo testified that other process coaches were complaining to him that Plaintiff was not performing his duties, specifically critical end of shift duties that required closing out the Daily Reports of Time ("DROTs"), and that they were having to work much longer shifts than Plaintiff and being accused of making mistakes with time reporting because of Plaintiff's failures to perform his duties with respect to the DROT. (Closurdo Decl. ¶ 10.) Specifically, Mr. Closurdo testified as follows regarding the actual impact of attempting to accommodate Plaintiff's 8-hour shift/40 hour work week restriction:

> End of shift duties – e.g., closing DROT's (Daily Reports of Time) requires the process coach to monitor and verify each hourly worker's presence on the line through the end of the shift. Similarly, all quality, safety, disciplinary, work stoppage or other incidents that arise in the final hours of each shift – and there are always many – must be accurately recorded and reported in the end of shift reports. These and similar duties are essential functions of the process coach job. I started receiving numerous complaints from other process coaches that they were being blamed for delays in paying hourly workers or for incorrectly paying the workers because [Plaintiff] had failed to properly document and communicate issues affecting pay, safety, and downtime prior to abruptly leaving before the shift had ended. In addition, all other process

coaches were working much longer shifts than [Plaintiff] to complete their own duties even without having to take on the additional responsibility for [Plaintiff's] two hours of production followed by his shift closing duties. At some point, at least two process coaches refused to handle [Plaintiff's] closing duties because they were tired of being blamed by the UAW and the hourly workers for [Plaintiff's] mistakes and omissions.

(Closurdo Decl. ¶ 10.)

In February, 2017, Plaintiff initiated another medical leave. (Closurdo Decl. ¶ 14.) Plaintiff has not returned to work and now considers himself to be unable to work even with restrictions. (Johnson Dep. 192:3-193:9, 276:7-10, Dep. Ex. 24.) Dr. Dizon continues to represent to Ford that Plaintiff is unable to work in any capacity due to his back pain. (Dizon Tr. 53:12-54:9, 58:6-60:18.)

## II. LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). That

evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III. ANALYSIS

Plaintiff alleges that Ford violated both the ADA and the PWDCRA by failing to reinstate him to employment at FRAP with an accommodation for his 8-hour shift/40-hour work week medical restriction.[2]  Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The ADA "defines 'discrimination' to include 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (quoting 42 U.S.C. § 12112(b)(5)(A)).  "[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Id*. at 868.  Thus, "[w]hen an ADA plaintiff

---

[2] Claims under the PWDCRA typically are analyzed under the same standards applicable under the ADA. *See Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 433 (6th Cir. 2014) ("Claims under the PWDCRA "essentially track those under [the ADA].") (alterations in original) (internal quotation marks and citation omitted).

premises his claim upon [a failure to accommodate], we jettison the familiar *McDonnell Douglas* burden-shifting framework applicable in indirect-evidence cases . . . ." *Id*. at 869. "In order to establish a prima facie case for failure to accommodate, a plaintiff must show that: (1) [he] is disabled within the meaning of the Act; (2) [he] is otherwise qualified for the position, with or without reasonable accommodation; (3) [his] employer knew or had reason to know about [his] disability; (4) [he] requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Johnson v. Cleveland City Sch. Dist*., 443 F. App'x 974, 982–83 (6th Cir. 2011) (alterations added). "[A]n ADA plaintiff 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Kleiber*, 485 F.3d at 870 (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir.), *cert. denied*, 543 U.S. 817 (2004)).

"'[A]n employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified.'" *Kleiber*, 485 F.3d at 869 (quoting *Burns v. Coca–Cola Enters., Inc*., 222 F.3d 247, 257 (6th Cir. 2000)). "However, this duty does not require employers 'to create new jobs [or] displace existing employees from their positions . . . in order to accommodate a disabled individual.'" *Id. See also Henschel v. Clare County Road Comm'n*, 737

F.3d 1017, 1025 (6th Cir. 2013) (noting that "there is no requirement that an employer

. . . create a new position in order to return a disabled employee to work") (citing

*Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 634 (6th Cir. 1999)); *Hoskins v. Oakland

County Sheriff's Dept.*, 227 F.3d 719, 729 (6th Cir. 2000) (noting "that an employer

is not obligated to create a position not then in existence" and finding instructive

Seventh Circuit cases holding that the ADA "imposes no duty on an employer to

convert a temporary relief position into a new full time position"); *Gazvoda v. Sec'y

of Homeland Security*, No. 15-cv-14099, 2015 WL 7450397, at *4 (E.D. Mich. Nov.

24, 2015) (observing that "there is no requirement that an employer . . . create a new

position in order to return a disabled employee to work," and finding that plaintiff's

failure to offer evidence "that a position he seeks is actually open" is fatal to a failure

to accommodate claim); *Duvall v. Georgia-Pacific Consumer Products, L.P.*, 607 F.3d

1255, 1263-64 (10th Cir. 2010) (finding that an ADA plaintiff has the burden to

"specifically identify[] a vacant position, reassignment to which would serve as a

reasonable accommodation"); *Kalskett v. Larson Mfg. Co. of Iowa*, 146 F. Supp. 2d

961, 976-77 (N.D. Iowa 2001) (where no new "team leaders" were hired as a result

of a reorganization, and employer's business plan called for filling team leader

positions with actively employed team leaders, no team leader position became open

as a result of the reorganization).

"To be "otherwise qualified" for the job, the employee bears the burden of showing []he can perform the "essential functions" of the job, with or without accommodation." *Cleveland City School Dist.*, 443 F. App'x at 983 (citing 42 U.S.C. § 12111(8); *Hedrick*, 355 F.3d at 456). "'If the employer claims [ ] that the disabled individual would be unqualified to perform the essential functions of the job even with the proposed accommodation, the disabled individual must prove that he or she would in fact be qualified for the job if the employer were to adopt the proposed accommodation.'" *Id.* (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996)). "The employee also bears the burden of proposing reasonable accommodations; an employee's claim must be dismissed if the employee fails to identify and request such reasonable accommodations. Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer." *Id.* (Internal citation omitted).

**A.   Plaintiff Has Failed to Create A Genuine Issue of Material Fact That There Was No Open Position at FRAP Between July 2015 and March 2016 Into Which He Could Have Been Placed**

It is clear that employers are simply not obligated "to create new jobs [or] displace existing employees from their positions . . . in order to accommodate a disabled individual." *Kleiber*, 485 F.3d at 869 (internal quotation marks and citations

omitted). *See also Henschel*, *Hoskins*, and *Gazvoda*, *supra*. Plaintiff's failure to submit *any* evidence that Ford had an open process coach position at FRAP into which Plaintiff could have been placed during the nine-month period from July 2015 through March 2016 about which he complains, is fatal to his ADA claim. The fact that, as several of Plaintiff's co-workers testified and as Ford concedes, there was plenty of work to be done by an extra process coach at FRAP during that time period does not demonstrate that their was an "open" or "vacant" position, which had been allocated by Ford corporate finance. The unrebutted evidence is that Ford was staffing production at FRAP during that period of time with "borrowed" process coaches who were layoffs from other Ford plants, who were being paid by their home plants, and Ford did not have an open or vacant process coach position at FRAP during the period of time in which Plaintiff claims that Ford failed to accommodate him.

As discussed *supra*, at the time Plaintiff attempted to return to work on July 13, 2015, he had been moved to inactive status, and no longer held an allocated position, which had been filled in his absence. Ford's corporate finance function sets manpower levels by department and manufacturing facility and Mr. Closurdo had no authority at FRAP to exceed the manpower allocation dictated by corporate finance. Ford's unrebutted evidence establishes that FRAP cannot exceed the number of heads allocated to it. During the nine-month period that Plaintiff claims Ford failed to

accommodate him, FRAP did not have an open process coach position. While Mr. Closurdo was authorized to obtain temporary relief when necessary for short periods of time (usually two weeks) utilizing process coaches from other plants who were under temporary layoffs, this did not create "open" positions. When filling in at FRAP, these "borrowed" coaches continued to collect their salaries from their home plants. Plaintiff acknowledged in his deposition his understanding that the FRAP was allocated a manpower maximum that they could not exceed. Although Plaintiff believed that there were "open" positions during this nine-month period of time, he acknowledged that these "positions" were being filled by FRAP with process senior process coaches from other Ford plants. Each time Plaintiff attempted to return to work once he went to inactive status in May 2015, there were no allocated positions open until his April 2016 attempt. Mr. Closurdo's testimony is unrebutted that since his assignment to FRAP in August, 2015, FRAP had its first process coach manpower opening in April, 2016, when Plaintiff was finally reemployed.

Plaintiff complains that Mr. Glass never informed Plaintiff that there were no open manpower allocations for a process coach position at FRAP, and instead simply indicated that no work was available for Plaintiff within his restrictions. As discussed *supra*, Mr. Glass was unaware of the manpower allocations for process coaches at FRAP when he twice declined to indicate on Plaintiff's Manufacturing Pass that his

8-hour/shift/40-hour/week restriction could be accommodated. (Glass Decl. ¶ 5.)

Plaintiff testifies in his Declaration that Mr. Glass was motivated by an animus toward

Plaintiff because of Plaintiff's need to take medical leave.[3] Although Plaintiff and his

Declarants "believed" that Mr. Glass had the power to decide whether or not Plaintiff

could be reinstated to active status as a Ford employee, the unrebutted evidence is that

Mr. Glass did not have the authority to reemploy Plaintiff at any point during the nine

months that Plaintiff alleges he sought to return to FRAP. Mr. Glass did not have the

authority to hire or fire anyone, and could not have brought Plaintiff back to work

---

[3]  Plaintiff testifies in his Declaration that he "attended a group meeting with other process coaches, where James Glass said to [them] 'I don't like people who go off on medical leave. I've never been on medical leave in my life." (Pl.'s Resp. Ex. 6, Sept. 28, 2018 Declaration of Randona Johnson.) But Plaintiff's Declaration is not admissible as summary judgment evidence because it contains only an electronic signature. This Court's Electronic Filing Policies and Procedures, Revised May 2018, Rule 9(d), requires that "[a]n affidavit, declaration or paper containing the signature of a non-attorney shall be scanned and filed electronically." A declaration of a non-attorney bearing only an electronic signature only does not does not comply with this Rule. *See King v. Ambs*, No. 04-74867, 2006 WL 800751, at *11 n. 9 (E.D. Mich. March 28, 2016) (Borman, J.) (refusing to consider as competent summary judgment evidence a declaration bearing only the electronic signature of a non-attorney); *Weems v. City of Columbus, Ohio*, No. 05-cv-87, 2006 WL 2640636, at *3 (S.D. Ohio Sept. 13, 2006) (interpreting a local ECF filing rule identical to ECF Rule 9(d) and concluding that "[u]nder the local rules of this court, affidavits which are not notarized or which contain an electronic signature instead of the actual signature of the affiant are not properly signed, and therefore are not proper evidence under Rule 56"). Notably, the additional Declarations attached to Plaintiff's Response from his co-workers contain both electronic and actual signatures of the declarants. However, if the Plaintiff's Declaration were admissible, it fails to raise any genuine issue of material fact.

without the approval of Human Resources and Mr. Closurdo. In fact the 8/24/15 HR Letter that Plaintiff received from Ford explained exactly what steps Plaintiff had to follow in order to seek reemployment at Ford – "contact your supervisor and the Salaried Leave and Termination Unit immediately." (*See supra* note 2, 8/24/15 HR Letter, PgID 574.) Plaintiff did not follow these instructions and if he had he would have learned that there was no open position for a process coach at FRAP. Plaintiff's counsel conceded at the summary judgment hearing that ultimately it may have been determined that there was no allocated position for a process coach into which Plaintiff could have been placed, but argues that it was still incumbent on Ford to engage in the interactive process with Plaintiff, which Plaintiff submits Ford would have done were it not for the animus held by Mr. Glass toward the Plaintiff.[4] But Plaintiff has produced no evidence to contradict the substantial evidence submitted by Ford that FRAP had no open process coach positions during the nine month period

_____

[4] Plaintiff did not plead in his Complaint, nor articulate in his briefing, any theory of liability other than Ford's alleged failure to accommodate his medical restrictions. No separate claim of discriminatory conduct has been pleaded or pursued. Even if Plaintiff had asserted such a claim in addition to his failure to accommodate claim, such a claim would fail because Plaintiff has cannot establish that he was "otherwise qualified" for the position of a production supervisor. *Greiner v. Charter County of Macomb*, No. 14-cv-13979, 2017 WL 3977845, at *11 (E.D. Mich. Sept. 11, 2017) (finding that plaintiff's discriminatory termination claim failed for the same reason that his failure to accommodate claim failed – he was unable to demonstrate that he was "otherwise qualified" because he could not perform the essential functions of the job). *See infra* discussion at IIIB.

that Plaintiff sought to return and could not have reinstated Plaintiff's employment as a FRAP process coach during that period of time. It is well understood that an employer is not required to engage in the interactive process if the employee seeks a position that is not open. "[A] court need not consider whether there has been a failure to engage in the interactive process when a plaintiff fails to meet his burden of showing that a position to accommodate him was vacant." *Arthur v. American Showa, Inc.*, 625 F. App'x 704, 711 (6th Cir. 2015).

Although it is clear that there was plenty of work to be done at FRAP between July 2015 and March 2016, and that FRAP was "borrowing" process coaches from other plants and requiring process coaches to double-up on their zone coverage to keep up with production at FRAP, Ford addressed this staffing issue internally and did not create a new process coach position for which Plaintiff (or anyone else) could have applied during that period of time. Plaintiff has presented no evidence that FRAP hired or sought to hire any new process coach, or had an allocated position for, an additional process coach during the approximately nine-month period that Plaintiff claims FRAP failed to accommodate him. Nor has Plaintiff presented evidence suggesting that Ford has in the past allowed plants to exceed their allocated manpower allotments and therefore could have done so here. His ADA claim fails for this reason and Ford is entitled to summary judgment.

**B.    Plaintiff Has Failed to Create a Genuine Issue of Material Fact That He Could Perform the Essential Functions of a FRAP Process Coach During the Relevant Period**

Even if there had been an open position allocated by Ford corporate finance for a process coach at FRAP between July 2015 and April 2016, Plaintiff has failed to create a genuine issue of fact that he could have performed the essential functions of a FRAP process coach during that period of time. "An employee raising a failure-to-accommodate claim bears the initial burden to propose an accommodation that is reasonable." *Russ v. Memphis Light Gas & Water Division*, 720 F. App'x 229, 239 (6th Cir. 2017) (citing *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 480 (6th Cir. 2012) and *Kleiber*, 485 F.3d at 869). Although the ADA may "require[] an employer to restructure the marginal functions of a job as a reasonable accommodation," it "does not require the shifting of *essential* functions." *Keith v. County of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013) (internal quotation marks and citations omitted) (emphasis in original). *See also Bratten v. SSI Services, Inc.*, 185 F.3d 625, 632-33 (6th Cir. 1999) (observing that "[c]ourts have continuously found that employers are not required to assign existing employees . . . certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability," and finding that an accommodation that required "co-workers to perform as much as 20% of the essential automotive mechanic duties for [plaintiff]

when he needs such assistance," was not a reasonable accommodation as a matter of law); *Greiner v. Charter County of Macomb*, No. 14-cv-13979, 2017 WL 3977845, at *8-9 (E.D. Mich. Sept. 11, 2017) (noting that the ADA does not require employers to shift a plaintiff's essential job duties to other employees and concluding that plaintiff's requested accommodation that his employer "make others available to perform (or assist with) his duties is not a reasonable accommodation"). Where the employee proposes as an accommodation having other employees perform portions of his job duties for him, the employee bears the "burden to explain how the additional employees would assist only with [his] *nonessential* duties, because if they would assist with [his] *essential* duties, the accommodation would not be reasonable." *Russ*, 720 F. App'x at 239 (emphasis in original). A plaintiff cannot make out a *prima facie* case of failure to accommodate under the ADA without specifying the duties that others will be performing in his stead and establishing that those duties are nonessential to the position. *Id*.

"Essential functions generally are those that the employer's "judgment" and "written [job] description" prior to litigation deem essential." *E.E.O.C. v. Ford Motor Co*., 782 F.3d 753, 761-62 (6th Cir. 2015) (*en banc*) (citing 42 U.S.C. § 12111(8)). The Sixth Circuit has explained what renders a job function "essential" for purposes of the reasonable accommodation analysis:

> A "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position," 42 U.S.C. § 12111(9)(B), but "it does not include removing an 'essential function' from the position, for that is per se unreasonable." *Ford Motor*, 782 F.3d at 761 (citation omitted). Therefore, while a part-time work schedule may be a reasonable accommodation in some cases, 42 U.S.C. § 12111(9)(B), it is unreasonable in situations where the essential functions of the job require full-time attendance. *See White v. Standard Ins. Co.*, 529 Fed.Appx. 547, 549–50 (6th Cir. 2013). A job function is "essential" if it is "'fundamental,' (as opposed to 'marginal')," such that the position is "fundamentally altered" if the function is removed. *See [EEOC v.] Ford Motor*, 782 F.3d [753] at 762 (6ht Cir. 2015)] (citing 29 C.F.R. § 1630(n)(1)).

*Green v. BakeMark USA, LLC*, 683 F. App'x 486, 491-92 (6th Cir. 2017). The ADA does not "require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins*, 227 F.3d at 729.

The question here, similar to the question presented in *BakeMark*, is whether Ford "was correct in concluding that [Plaintiff] could not perform the essential functions of his [process coach] position working [eight] hours a day, such that [his requested] accommodation was unreasonable." 683 F. App'x at 492 (alterations added). The Sixth Circuit has suggested a number of relevant factors to consider in making this determination:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions ...;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

*BakeMark*, 683 F. App'x at 492 (quoting 29 C.F.R. § 1630.2(n)(3)).

In this case, consideration of these factors establishes that there is no genuine issue of material fact that FRAP's full-time shift work was an essential function of Plaintiff's job as a process coach, despite the fact that several co-workers seemed to believe that they could have picked up the job duties and shift work that Plaintiff was unable to perform. The written job description includes the "ability to work *any shift* as well as rotating shifts and weekends."[5] (Emphasis added.) The Closurdo and Glass Declarations establish that Ford considered full time shift work to be essential, particularly the final hours of any shift, and it is undisputed that shifts were running

_____

[5] Plaintiff argues that the term "shift" as used in the job description requirement that a process coach be able to work "any shift," refers to the "shifts" as defined in a section of a Collective Bargaining Agreement ("CBA") that Plaintiff attaches to his Response that identifies shifts as midnight, day, and afternoon, dependent upon the start time of the shift. (Pl.'s Resp. Ex. 3.) First of all, Mr. Closurdo testifies that the provisions of this CBA (which Plaintiff fails even to identify or authenticate) apply to hourly workers and do not even apply to salaried process coaches like the Plaintiff. (Def.'s Reply, Ex. 12, Suppl. Closurdo Decl. ¶ 2.) Plaintiff does not dispute that the terms of this unidentified CBA did not apply to Plaintiff's position as process coach. In any event, this section does nothing more than label a shift depending on when it begins. This section does not in any manner purport to define the length of a shift, which were routinely in excess of eight hours at FRAP during the relevant nine month period, as demonstrated by the hourly production shift schedules and process coach time records produced to the Plaintiff in this litigation and submitted by Ford in its Reply. (Def.'s Reply, Ex. 12, Suppl. Closurdo Decl. Exs. A and B.)

far in excess of 8 hours during the relevant time period. It is undisputed that the work that is performed in the last two-hours of the process coach's job (principally closing out the DROT) is some of the most tedious and important, and this is the work that Plaintiff admitted that he intended to shift to others to perform for him. It is also noteworthy that Plaintiff testified that his medical leaves of absence were caused by the demanding mandatory overtime and long shift work that he was being required to perform. The evidence is uncontested that production schedules required regular overtime (resulting in shifts well in excess of eight hours) for FRAP process coaches the entire period of time during which Plaintiff sought his limited shift work accommodation.

While the Declarations that Plaintiff provides suggest that there was work available for the Plaintiff, none of them disputes the evidence that production schedules required 10-15 hour shift work for process coaches during the period of time that Plaintiff sought to work only 8-hour shifts. Craig Thomas states in his Declaration that "[t]here were periods of time between July, 2015 and April, 2016, where the plant was running less than eight hour shifts and [Plaintiff] could have worked those within his restrictions." (Thomas Decl. ¶ 18.) However, Thomas fails to identify any particular 8-hour shift, or any particular dates on which 8-hour shifts were run, and fails to support this statement with any evidence that would rebut the

actual time logs produced by Ford for the relevant nine month period that reflect the actual shifts worked by process coaches at FRAP during that time period. Thomas's Declaration is insufficient to raise a genuine issue of material fact as to the length of shifts worked by process coaches at FRAP during the relevant nine month period.

Craig Thomas also states in his Declaration that in his opinion, Plaintiff should have been allowed to work within his restrictions during the entire nine-month period at issue here "as other salary employees had done in the past." (Thomas Decl. ¶ 16.) Thomas offers no specific instance of a single FRAP process coach having been allowed to work with an 8-hour shift restriction when production schedules required process coaches to routinely work minimum ten hour shifts. *See, e.g. Reeder v. County of Wayne*, 177 F. Supp. 3d 1059, 1077-78 (E.D. Mich. 2016) (finding that most of the facts indicated that working over eight hours per day was an essential function of plaintiff's job but finding a genuine issue of material fact where "Plaintiff presented some evidence that other employees were allowed to be exempted from mandatory overtime due to disabilities," thus creating a jury question as to "whether working overtime was truly an "essential" function"). There is no evidence of evidentiary quality in this record to suggest that Ford previously allowed a medically restricted process coach to work only 8-hour shifts, shifting all end of shift duties to other process coaches, when production schedules required process coaches to work 10-13

hour shifts on a daily basis. Thomas's Declaration is insufficient evidence on which to find a genuine issue of material fact that Ford had previously accommodated similarly disabled employees under the same circumstances by allowing restricted shift hours.

Finally, in support of his argument that the end of shift duties he sought to shift to others were not "essential" and could easily have been handled by his fellow process coaches, Plaintiff again offers the opinion of Craig Thomas (who as a matter of note is currently involved in litigation with Ford over his departure from the company). Craig Thomas opines conclusorily in his Declaration that "[o]ther process coaches or supervisors could easily have covered for [Plaintiff] if needed on a day where the shift was longer than eight hours." (Thomas Decl. ¶ 17.) But this "opinion" is unsupported by any evidence at all – the identity of other "willing" process coaches is not provided, the details of the duties that would be required to be covered is unspecified, and there is no explanation at all of how this would be accomplished without affecting the rights of other workers and without disrupting production at FRAP. A plaintiff cannot make out a *prima facie* case of failure to accommodate without specifying the duties that others will be required to perform and establishing that those duties are nonessential. *Russ*, 720 F. App'x at 239. And importantly the Plaintiff was not requesting coverage on "a day" when a shift

happened to exceed eight hours – he was seeking an accommodation on *every* day that a shift exceeded eight hours, which occurred on virtually every day during the relevant nine month period. Thomas's Declaration falls far short of creating a genuine issue of material fact regarding the ability of other process coaches to handle Plaintiff's end of shift duties on a daily basis – indeed Thomas does nothing more than posit an "if come" scenario, based on the assumption (with no evidentiary support) that Ford would be able to count on every process coach called upon to do so to perform Plaintiff's end of shift duties after Plaintiff walks off the job after 8-hours of work. Such supposition does not suffice to create a genuine issue of material fact. The best evidence of the reasonableness of this accommodation is what actually occurred when FRAP did finally have an open position in April 2016, rehired Plaintiff and attempted to accommodate his 8 hour shift restrictions – Closurdo received "numerous complaints from other process coaches" who were being blamed for mistakes caused by Plaintiff's abrupt departure at the 8-hour point in his shifts, and outright refusals by certain process coaches to continue performing Plaintiff's end of shift duties. (Closurdo Decl. ¶ 10.) Thomas's Declaration is insufficient to raise a genuine issue of material fact that these end of shift duties were "marginal," or that other process coaches could "easily have" performed all of Plaintiff's end of shift duties, including closing out the DROT, and fully covered the two or more hours of his shifts that he

could not cover, during the relevant nine month period.

Plaintiff bears the burden of establishing that a requested accommodation is reasonable. "A 'reasonable accommodation' may include 'job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position,' 42 U.S.C. § 12111(9)(B), but 'it does not include removing an 'essential function' from the position, for that is per se unreasonable.'" *BakeMark*, 683 F. App'x at 491 (quoting *Ford Motor*, 782 F.3d at 761). Nor does the ADA "require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins*, 227 F.3d at 729. Here, Defendant has produced evidence that being "able to work any shift," whatever its length, was an essential function of Plaintiff's job as a process coach and Plaintiff was demonstrably unable to perform that function. Although Ford did attempt to accommodate Plaintiff's limited shift work restriction without success, this effort only demonstrated that full shift work was an essential function of Plaintiff's job and that shifting his job duties onto others was not a reasonable accommodation.

Plaintiff has produced no evidence to rebut Ford's evidence that being able to work a full shift (be it eight hours, ten hours, or thirteen hours) and to be present to complete the end of shift duties, are in fact essential functions of the production supervisor/process coach position. Defendant has produced the time logs for process coaches at FRAP during the nine month period that Plaintiff sought to return to FRAP,

which demonstrate that with the exception of certain weekend shifts (which Plaintiff also sought to be relieved of working given his 40-hour work week restriction) all shifts were a minimum of ten (10) hours and frequently were in excess of twelve (12) hours. While Plaintiff claims that he was returned to work with a four-hour restriction a year earlier, following some previous medical leave, this is not relevant to determining whether the production demands during the nine month period at issue here required process coaches to work minimum 10-hour shifts. The unrebutted evidence is that these are the hours that in fact were required of process coaches during the nine month period at issue here. Even viewing the facts in the light most favorable to the Plaintiff, no reasonable juror could conclude that, during the closed nine-month period about which Plaintiff complains in this action, the end of shift duties, including closing the DROT, were "marginal" functions of the process coach/production supervisor position that could "easily" have been shifted to his fellow process coaches.

Plaintiff argues that "[a]n alternative basis for liability on the part of Defendant, in relation to Plaintiff's failure to accommodate claim, is Defendant's failure to engage in a proper 'interactive process' with Plaintiff in connection with his request for accommodation." Pl.'s Resp. 14, PgID 685. Plaintiff seems to suggest that despite the possible ultimate failure of any effort to bring Plaintiff back to FRAP with his 8-

hour restriction, Ford was obligated to at least engage in the interactive process –

presumably to "give it a try." However, it is well established that an employer's

obligation to engage in the interactive process is not independently actionable under

the ADA. "Employers who fail to engage in the interactive process in good faith [ ]

face liability [under the ADA] if a reasonable accommodation would have been

possible." *Lafata v. Church of Christ Home for the Aged*, 325 F. App'x. 416, 422 (6th

Cir. 2009) (internal quotation marks and citations omitted) (alterations in original).

"'[T]he employer fails to participate in the interactive process only if, among other

things, the employee can demonstrate that the employee could have been reasonably

accommodated but for the employer's lack of good faith.'" *American Showa, Inc.*, 625

F. App'x at 711 (quoting *Breitfelder v. Leis*, 151 F. App'x 379, 386 (6th Cir. 2005)).

An employer's alleged failure to engage in good faith in the interactive process "is

actionable only if it prevents identification of an appropriate accommodation for a

qualified individual." *E.E.O.C. v. Ford Motor*, 782 F.3d at 766 (internal quotation

marks and citation omitted) (emphasis omitted). "Courts thus need not consider this

form of non-independent liability if the employee fails to present evidence sufficient

to reach the jury on the question of whether [he] was able to perform the essential

functions of her job with an accommodation." *Id*. (internal quotation marks and

citation omitted). "Because [Plaintiff] could not perform the essential functions of his

position with any reasonable accommodation [], he was not a "qualified individual" under the ADA [and] summary judgment [is] therefore proper on this claim." *BakeMark*, 683 F. App'x at 493.

## IV.    CONCLUSION

Ford is entitled to summary judgment for two separate and independent reasons: (1) there is no genuine issue of material fact that there was no open process coach position at FRAP into which Ford could have placed the Plaintiff between July 2015 and April 2016, the period during which he alleges Ford failed to accommodate his medical restrictions; and (2) there is no genuine issue of material fact that Plaintiff could not perform the essential functions of a FRAP process coach between July 2015 and April 2016, the specific period his Complaint alleges that Ford failed to accommodate his medical restrictions.    Accordingly, the Court GRANTS Ford's motion for summary judgment and DISMISSES Plaintiff's Complaint.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  January 2, 2019